UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MCKESSON CORPORATION,

    Plaintiff,

v.                     Case No: 8:20-cv-2186-T-33AAS

BENZER PHARMACY HOLDING
LLC, BENZER NV 1 LLC,
ALPESH PATEL and
HEMA PATEL,

    Defendants.
_____/

**ORDER**

    This matter comes before the Court upon consideration of Plaintiff and Counterclaim-Defendant McKesson Corporation's partial Motion to Dismiss Counterclaim (Doc. # 20), filed on November 4, 2020. Defendants and Counterclaim-Plaintiffs Benzer Pharmacy Holding LLC, Benzer NV 1 LLC, Alpesh Patel, and Hema Patel (collectively, the "Benzer Parties") responded on November 18, 2020. (Doc. # 22). For the reasons below, the Motion is granted in part.

**I.**   **Background**

    The Benzer Parties operate pharmacies in the United States and have contracted with McKesson, a supplier of pharmaceutical drugs, since 2010. (Doc. # 17 at 22-23). In October 2016, the Benzer Parties entered into a supply

agreement (the "Agreement") with McKesson, which is the subject of this suit. (Id. at 23). In pertinent part, the Agreement includes the following reservation clause:

> McKesson reserves the right, in its sole discretion, to change a payment term (including imposing cash payment on delivery), to limit total credit and/or to suspend or discontinue the shipment of any orders to [the Benzer Parties] if McKesson concludes that (I) there has been a material adverse change in the [Benzer Parties'] financial condition or payment performance or (II) [the Benzer Parties have] ceased or [are] likely to cease to meet McKesson's credit requirements.

(Id. at 24). Additionally, the "Agreement carried significant penalties for any late payments." (Id.).

The parties also had certain customary dealings apart from the Agreement. (Id. at 23-24). For example, "it was customary for McKesson to issue invoices from Saturday through Friday that would be payable the Friday of the third following week." (Id. at 23). Because the Benzer Parties purchased significant amounts of pharmaceutical products from McKesson, these "payment terms had a significant impact" on the Benzer Parties' cash flow. (Id. at 24).

In early 2019 – about three years after the parties entered into the Agreement – the business relationship began deteriorating. (Id.). The Benzer Parties allege that McKesson began interfering with their business in a number of ways.

2

First, McKesson allegedly "sent a letter to [a competing] supplier for the sole purpose of persuading the supplier that it was at risk of a claim from McKesson if it did business with the Benzer Parties." (Id.). Next, after the Benzer Parties began discussing getting acquired by another entity, McKesson allegedly "disparaged the Benzer Parties to [the] potential acquirer," which caused "the acquirer to lose interest in the transaction and cease negotiations with the Benzer Parties." (Id. at 26).

Apart from this alleged meddling in the Benzer Parties' dealings with third parties, "McKesson also began arbitrarily [and unilaterally] changing its established course of conduct with the Benzer Parties." (Id. at 24). For instance, "[i]n February 2019, McKesson changed its policy so that, if one of the Benzer Parties or any of their affiliates failed to make a payment on time, it put the accounts of all . . . Benzer Parties on hold." (Id.). McKesson also "began demanding repayment of loans, despite such loans not being due," and "refused to subordinate its position in the Benzer Parties' accounts receivable" which prevented the Benzer Parties from accessing a $7.5 million line of credit. (Id. at 26).

Furthermore, in July 2019, without reason, and with only one week's notice, "McKesson demanded that payments under the

. . . Agreement be made on the Tuesday of the third week following the date of the invoice, as opposed to the Friday date previously used by the parties." (Id. at 25). The Benzer Parties aver that these changes in McKesson's payment terms "significant[ly] impact[ed] . . . [their] cash flow and operations." (Id.). Namely, these changes "limit[ed] the amount of product that the Benzer Parties could order, the Benzer Parties were not able to meet all of their customers' needs," and the Benzer Parties suffered "a significant loss in revenue." (Id.). And, under these new terms, McKesson "began charging late fees." (Id.). McKesson would then apply "the Benzer Parties' payments to [the] late fees, rather than to payment of amounts incurred for pharmaceutical supplies." (Id. at 26).

McKesson initiated the underlying suit on September 16, 2020, alleging various breach-of-contract claims. (Doc. # 1). On October 14, 2020, the Benzer Parties filed their answer and counterclaim. (Doc. # 17). The counterclaim includes claims against McKesson for breach of contract (Count I), breach of the implied duty of good faith and fair dealing (Count II), violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count III), accounting (Count IV), declaratory judgment (Count V), tortious interference

4

with a business relationship (Count VI), and tortious interference with a business expectancy (Count VII). (Id.).

On November 4, 2020, McKesson moved to dismiss Counts II, III, V, and VI of the counterclaim for failure to state a claim, as well as for partial dismissal of Count VII. (Doc. # 20). In the alternative, McKesson moves for the Court to strike Count VII. (Id.). The Benzer Parties have responded (Doc. # 22), and the Motion is now ripe for review.

## II.  **Legal Standard**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court accepts as true all the allegations in the counterclaim and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the counterclaim-plaintiff with all reasonable inferences from the allegations in the counterclaim. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a [counterclaim] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [counterclaim-plaintiff's] obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)
(quotations and citations omitted). Courts are not "bound to
accept as true a legal conclusion couched as a factual
allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The
Court must limit its consideration to "well-pleaded factual
allegations, documents central to or referenced in the
[counterclaim], and matters judicially noticed." La Grasta v.
First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

## III.  Analysis

McKesson seeks dismissal of Counts II, III, V, and VI of
the counterclaim, along with Count VII to the extent that it
purports to "state a claim for tortious interference with
unidentified customers." (Doc. # 20 at 1-2). Alternatively,
McKesson moves the Court to strike Count VII. (Id.). The Court
will address each claim in turn.

### A.  Breach of Implied Duty of Good Faith and Fair Dealing

First, McKesson moves to dismiss Count II, the Benzer
Parties' claim for breach of the implied duty of good faith
and fair dealing. (Doc. # 20 at 4). McKesson argues that Count
II fails to state a claim upon which relief can be granted
because it "merely repeat[s] the allegations in [the Benzer
Parties'] breach of contract claim." (Id. at 5). The Benzer

Parties respond that their "claim for breach of the implied covenant of good faith and fair dealing is not merely duplicative, but is a 'gap-filling' cause of action addressing the parties' expectations under the contract and McKesson's bad faith exercise of discretion under the contract to further its own interests." (Doc. # 22 at 7-8).

"Florida courts recognize an implied covenant of good faith and fair dealing in every contract." Shibata v. Lim, 133 F. Supp. 2d 1311, 1318 (M.D. Fla. 2000) (citing Burger King Corp. v. Weaver, 169 F.3d 1310, 1315 (11th Cir. 1999); Cnty. of Brevard v. Miorelli Eng'g, Inc., 703 So.2d 1049, 1050 (Fla. 1997)). "[T]o state a claim for breach of the implied covenant of good faith and fair dealing, plaintiffs must identify the specific contract term(s) giving rise to the implied duty of good faith and also allege how defendants breached their implied duty, alleging facts different from those giving rise to the breach of contract claim." Watts-Robinson v. Anderson Reporting Servs., Inc., 3:11-cv-290-J-37JBT, 2011 WL 13295707, at *2 (M.D. Fla. Sept. 22, 2011) (quoting Stallworth v. Hartford Ins. Co., No. 3:06-cv-89-MCR/EMT, 2006 WL 2711597, at *6 (N.D. Fla. Sept. 19, 2006)). "The duty of good faith must relate to the performance of an express term of the contract and is not an abstract and

independent term of a contract which may asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." ACG S. Ins. Agency, LLC v. Safeco Ins. Co., No. 8:19-cv-528-T-36AAS, 2019 WL 8273657, at *8 (M.D. Fla. Dec. 16, 2019) (quoting Resnick v. AvMed, Inc., 693 F.3d 1317, 1329 (11th Cir. 2012)).

Here, the Benzer Parties allege that McKesson breached the covenant of good faith and fair dealing implied in the Agreement by "unilaterally changing the payment terms to which the parties had previously been operating," thereby "unfairly interfer[ing] with the Benzer Parties' receipt of the . . . Agreement's benefits." (Doc. # 17 at 28). Specifically, the counterclaim alleges that "McKesson materially breached the . . . Agreement by . . . changing the payment dates and terms and limiting the Benzer Parties' credit, despite the fact that there had been no material adverse change in the Benzer Parties' financial condition or payment performance and the Benzer Parties had not ceased, or become likely to cease, meeting McKesson's credit requirements." (Id.). The Benzer Parties claim that McKesson made these changes "to harm the Benzer Parties in an attempt to prevent them from being able to leave McKesson and begin doing business with a new supplier." (Id.).

The Benzer Parties allege the same breaches in their breach of contract claim. Precisely, Count I states:

> McKesson materially breached the Supply Agreement, by, as set forth herein, changing the payment dates and terms and limiting the Benzer Parties' credit, despite the fact that there had been no material change in the Benzer Parties' financial condition or payment performance and the Benzer Parties had not ceased, or become like to cease, meeting McKesson's credit requirements. Instead, McKesson made the foregoing changes in order to harm the Benzer Parties in an attempt to prevent them from being able to leave McKesson and begin doing business with a new supplier. McKesson had no contractual justification to make the foregoing changes to the Benzer Parties' payment terms and credit limits and its decision to do so breached the Supply Agreement.

(Id. at 27). And, Counts I and II both cite to the same facts in the body of the counterclaim. (Id. at 26-27).

Therefore, the only apparent difference between the counterclaim's breach of contract and breach of the implied covenant of good faith and fair dealing claims is that, in the latter claim, the Benzer Parties allege that these breaches "unfairly interfered with the Benzer Parties' receipt of the . . . Agreement's benefits." (Id. at 28). This statement alone, however, does not change the fact that both claims are seeking relief solely on the basis of McKesson's changes to their payment terms. Because both claims are seeking the same relief, based on the same actions leading to

alleged breaches of the same contract, the Benzer Parties have failed to state a distinct claim for breach of the implied covenant of good faith and fair dealing apart from their breach-of-contract claim. See Live Nation Worldwide, Inc. v. Cohl, No. 10-24144-CIV/ALTONAGA/Simonton, 2011 WL 13223480, at *5 (S.D. Fla. May 3, 2011) ("If the allegations do not go beyond the statement of a mere contract breach, and relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous and no additional claim is actually stated." (citation omitted)).

Additionally, the counterclaim fails to identify a specific contractual term in the Agreement that has been breached that forms the basis of their claim. Rather, the claim simply states that "McKesson materially breached the Supply Agreement[.]" (Doc. # 17 at 28). Thus, even if it were not duplicative, this claim would fail for lack of specificity. See Burger King, 169 F.3d at 1318 ("In the present case, the district court correctly concluded that Weaver's claim for breach of the implied covenant must fail as a matter of law, because Weaver cited no express provision of either franchise agreement that has been breached.").

Therefore, the Motion is granted as to this requested

relief and Count II is dismissed with prejudice. See Accardi v. EMS Aviation, Inc., No. 2:10-cv-469-FtM-36DNF, 2011 WL 13294635, at *3 (M.D. Fla. Nov. 16, 2011) (dismissing a claim for breach of the implied covenant of good faith and fair dealing with prejudice because it was "wholly subsumed by [the plaintiff's] breach of contract claims").

### B. **FDUTPA**

Next, McKesson moves to dismiss Count III, the Benzer Parties' FDUTPA claim, arguing that it fails to "assert that McKesson's actions were wrongful outside the context of their contractual obligations." (Doc. # 20 at 6). The Benzer Parties counter that they have sufficiently pled an FDUTPA claim because "Florida courts have consistently held that an action giving rise to a breach of contract may also constitute an[] unfair or deceptive act, and that such a claim is always cognizable under . . . FDUTPA." (Doc. # 22 at 8).

To establish a cause of action under FDUTPA, a plaintiff must sufficiently allege these elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Kertesz v. Net Transactions, Ltd., 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009) (quoting City First Mortg. Corp. v. Barton, 988 So.2d 82, 86 (Fla. 4th DCA 2008)). "A deceptive practice is one that is likely to mislead consumers, and an unfair

practice is one that 'offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" Bookworld Trade, Inc. v. Daughters of St. Paul, Inc., 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) (quoting Rollins, Inc. v. Butland, 951 So.2d 860, 869 (Fla. 2d DCA 2006)).

"Florida law permits a FDUTPA claim to travel with a related breach of contract claim if the FDUTPA claim challenges the acts underlying or 'giving rise' to the breach, and does not 'rely solely on a violation of the Agreement as a basis for assertion of a FDUTPA claim.'" Kenneth F. Hackett & Assocs., Inc. v. GE Cap. Info. Tech. Sols., Inc., 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010) (quoting Rebman v. Follett Higher Educ. Grp., Inc., 575 F. Supp. 2d 1272, 1279 (M.D. Fla. 2008)). Relatedly, "the Florida Supreme Court [has] cautioned that a breach of contract claim without significant allegations of unfair or deceptive conduct is insufficient to state a cause of action under FDUTPA." Hache v. Damon Corp., No. 8:07-cv-1248-T-30EAJ, 2008 WL 912434, at *2 (M.D. Fla. Apr. 1, 2008) (citing PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 n.2 (Fla. 2003)).

Here, the Benzer Parties allege that McKesson's conduct of "unilaterally changing the payment and credit terms to

which the parties had been operating and agreed, constitutes
unfair and deceptive acts and practices which are prohibited
and actionable under FDUTPA." (Doc. # 17 at 29). The
counterclaim further avers that this conduct "is of the type
that is likely to mislead consumers" and that the "Benzer
Parties have suffered actual damages as the result of [these]
acts." (Id.).

However, this is exactly the conduct that the Benzer
Parties allege establishes their breach-of-contract claim,
which states: "McKesson materially breached the . . .
Agreement by, as set forth herein, changing the payment dates
and terms and limiting the Benzer Parties' credit." (Id. at
27). Given that the FDUTPA claim is no more specific, the
Court is unable to conclude that it rests on any basis apart
from the counterclaim's cause of action for breach of
contract. (Id. at 28-29). As the court explained in Varnes v.
Home Depot USA, Inc., No. 3:12-cv-622-J-99TJC, 2012 WL
5611055 (M.D. Fla. Nov. 15, 2012):

> [The Benzer Parties' FDUTPA] claim merely restates
> the allegations of [their] breach of contract . .
> . claims, without noting which facts show deceptive
> or unfair practices. [The claim] contain[s]
> conclusory statements that track the language of
> FDUTPA. Plaintiff[s] correctly state[] that a
> FDUTPA claim can coexist with a breach of contract
> claim. However, without significant allegations of
> unfair or deceptive conduct, there can be no claim

> under FDUTPA. Formulaic recitation of the elements
> under FDUTPA using conclusory statements is not
> enough to state a cause of action.

Varnes, 2012 WL 5611055, at *1 (citations omitted).

And, although in their response to this Motion, the Benzer Parties argue that their FDUTPA claim does not rest solely on their breach-of-contract claim because they have "alleg[ed] numerous acts underlying the breach that were, by themselves, unfair or deceptive," such as by "changing the payment terms, misapplying payments, wrongfully charging late fees and interest, and demanding repayment of loans, despite those loans not being due," neither the breach-of-contract nor the FDUTPA claim specify which of these actions relate to either cause of action. (Doc. # 17 at 26-27; Doc. # 22 at 9). Further, the counts each cite to the exact same set of allegations in the body of the counterclaim: "Paragraphs 1 through 24." (Doc. # 17 at 26, 28).

Therefore, the Court is unable to determine whether anything distinct from the breach of the Agreement constitutes deceptive or unfair conduct. See Krush Commc'ns, LLC v. Network Enhanced Telecom, LLP, No. 8:13-cv-2688-T-30TGW, 2014 WL 12625758, at *4 (M.D. Fla. Apr. 29, 2014) ("The amended complaint fails to allege sufficient facts associated with [the defendant's] deceptive or unfair practices. [The

plaintiff] alleges conclusory statements regarding [the defendant's] 'unfair and deceptive practice' but does not include facts that support these remarks other than the facts . . . [the defendant] relies upon in its breach of contract claim. [The plaintiff] cannot insert the magic words 'deceptive' and 'unfair' to state a claim without including any further details.").

Accordingly, the Motion is granted as to this requested relief and Count III is dismissed without prejudice. See Horton v. Woodman Labs, Inc., No. 8:13-cv-3176-T-30MAP, 2014 WL 1329355, at *4 (M.D. Fla. Apr. 2, 2014) (dismissing an FDUTPA claim without prejudice that alleged "conclusory statements regarding [the defendant's] 'unfair, unconscionable, or deceptive practices' but [did] not include facts [supporting] these conclusory remarks other than the facts associated with the breach of express warranty claim").

C. **Declaratory Judgment**

Next, McKesson moves to dismiss Count V, the Benzer Parties' claim for declaratory judgment, arguing that it is redundant because the issue of whether McKesson had a basis for changing the Agreement's payment terms will "necessarily be resolved in the underlying action." (Doc. # 20 at 7-8). The Benzer parties respond that they "would suffer

15

significant harm should they be denied the opportunity to seek declaratory relief with no alternative means of reaching the same outcome." (Doc. # 22 at 11).

Although the Benzer Parties seek a declaratory judgment under Florida's Declaratory Judgment Act, this Act is only "a procedural mechanism that confers subject matter jurisdiction on Florida's circuit and county courts; it does not confer substantive rights to litigants." Nat'l Fire & Marine Ins. Co. v. Palm Springs Gen. Hosp., Inc., No. 16-61852-CIV-DIMITROULEAS, 2016 WL 10587943, at *2 (S.D. Fla. Oct. 28, 2016) (citation omitted). Therefore, "[w]here, as here, the claim for declaratory relief arises in a federal diversity jurisdiction action, the Court must apply the federal Declaratory Judgment Act, not the Florida Declaratory Judgment Act." United State Sols., LLC v. Powell, No. 19-61970-CV-DIMITROULEAS, 2019 WL 9045387, at *2 (S.D. Fla. Oct. 10, 2019) (citation omitted).

"In claims arising under the Declaratory Judgment Act, 'a court maintains broad discretion over whether or not to exercise jurisdiction over claims.'" Dantzler, Inc. v. Hubert Moore Lumber Co., No. 7:13-CV-56 (HL), 2013 WL 5406440, at *2 (M.D. Ga. Sept. 25, 2013) (quoting Knights Armament Co. v. Optical Sys. Tech., 568 F. Supp. 2d 1369, 1374 (M.D. Fla.

16

2008)). Therefore, "[c]ourts may dismiss a counterclaim for declaratory judgment as redundant." Cantonis Co. v. Certain Interested Underwriters at Lloyds, London, No. 18-81703-CIV-ROSENBERG/REINHART, 2019 WL 3429962, at *3 (S.D. Fla. May 9, 2019) (citation omitted). "When deciding whether to dismiss a counterclaim on the basis that it is redundant, courts consider whether the declaratory judgment serves a useful purpose." Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC, 783 F. Supp. 2d 1214, 1217 (2011) (citation omitted). "To determine whether the declaratory judgment serves a useful purpose, courts [look at] whether resolution of plaintiff's claim, along with the affirmative defenses served by defendants, would resolve all questions raised by the counterclaim." Id. (citation omitted). Still, even if a "counterclaim is wholly redundant, [courts] may exercise . . . discretion by not dismissing the counterclaim." Cantonis, 2019 WL 3429962, at *3 (citation omitted).

Importantly, courts often treat counterclaims for declaratory relief in breach-of-contract cases differently:

> In instances where the declaratory relief is based on contract interpretation, courts are reluctant to dismiss a counterclaim for declaratory relief as redundant even when it is a near 'mirror image' of the complaint, because a 'ruling adverse to the plaintiff on plaintiff's claim would merely result in a judgment that plaintiff was not entitled to

> the relief requested; although it might logically
> flow from that that judgment that defendant's
> interpretation of the contract was the correct one,
> defendants would not be entitled to a judgment to
> that effect unless [they] specifically requested
> one.'

Medmarc, 783 F. Supp. 2d at 1217 (quoting ProCentury Ins. Co. v. Harbor House Club Condo. Ass'n, Inc., 652 F.Supp.2d 552, 556-557 (D.N.J. Aug. 19, 2009)).

In their counterclaim, the Benzer Parties seek a judgment declaring that they "did not default under the . . . Agreement and that McKesson had no right to change the payment terms thereunder or charge late fees." (Doc. # 17 at 30). By comparison, McKesson's underlying complaint seeks "to collect the balance due" because of the Benzer Parties' default on their obligations arising under the Agreement. (Doc. # 1 at ¶ 26-29). In the Benzer Parties' answer to the complaint, they include the following affirmative defenses: "[McKesson's] causes of action are barred because it breached the contract at issue. . . . To the extent that [McKesson] is entitled to any damages, [the Benzer parties] are entitled to a set off for damages suffered by them as a result of [McKesson's] conduct." (Doc. # 17 at 22).

Although resolution of the underlying complaint may very well determine whether the Benzer Parties were in default on

18

their obligations or whether McKesson was entitled to charge late fees, the Court cannot say at this juncture that such resolution would fully resolve the relief sought in this counterclaim. See Frank v. Rockhill Ins. Co., No. 2:18-cv-162-FtM-99CM, 2018 WL 5619325, at *4 (M.D. Fla. Oct. 30, 2018) ("Thus, at this early stage of the case, it cannot be said that Rockhill's Counterclaim serves 'no useful purpose.'"). Given the discretion accorded to the Court, and the fact that even if the Benzer Parties prevail in the underlying action, they would not necessarily receive a declaration stating there was no basis for McKesson to assess late fees against them, the Court finds dismissal inappropriate at this juncture. See Callis Commc'ns, Inc. v. Hasco Med., Inc., No. 16-627-KD-N, 2017 WL 2349016, at *5 (S.D. Ala. May 5, 2017) ("While Callis is correct that Hasco's counterclaim for declaratory relief questions issues that have been asserted in the Complaint and affirmative defenses, it is also viable that a judgment adverse to Callis, may not conclusively determine whether the . . . contract is enforceable."), report and recommendation adopted, No. 16-00627-KD-N, 2017 WL 2345629 (S.D. Ala. May 30, 2017).

Further, if, as McKesson argues, this counterclaim is truly redundant, it would suffer no prejudice in allowing

this claim to proceed. See Regions Bank v. Commonwealth Land Title Ins. Co., No.11-23258-CIV, 2012 WL 5410609, at *5 (S.D. Fla. Nov. 6, 2012) ("If, as plaintiff argues, the counterclaims are truly repetitious, then plaintiff will not have to expend much time on any additional discovery or briefing." (citation omitted)). Therefore, the Motion is denied as to this requested relief. See Devs. Sur. & Indem. Co. v. Archer W. Contractors, LLC, No. 6:16-cv-1875-Orl-40KRS, 2017 WL 6947785, at *5 (M.D. Fla. Apr. 17, 2017), report and recommendation adopted, No. 6:16-cv-1875-Orl-40KRS, 2017 WL 8314655 (M.D. Fla. May 2, 2017) (allowing a potentially redundant counterclaim for declaratory relief).

### D. Tortious Interference with a Business Relationship

Next, McKesson seeks to dismiss Count VI, the Benzer Parties' claim for tortious interference with a business relationship. (Doc. # 20 at 8). McKesson argues that the counterclaim fails to state a claim upon which relief can be granted "[b]ecause the Benzer Parties' relationship with the general consuming public is not protected, and because they fail to identify any particular customer." (Id. at 9 (citation omitted)). The Benzer Parties argue that they have sufficiently alleged these relationships. (Doc. # 22 at 12).

To state a cause of action for tortious interference

with a business relationship under Florida law, a plaintiff must sufficiently plead these elements: "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." Duty Free Ams., Inc. v. Estée Lauder Cos., 797 F.3d 1248, 1279 (11th Cir. 2015) (citing Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla. 1994)).

Regarding the first element, "[a] business relationship need not be evidenced by a contract, but it generally requires an understanding between the parties that would have been completed had the defendant not interfered." Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc., 262 F.3d 1152, 1154 (11th Cir. 2001) (citation omitted). Although "the plaintiff may allege 'tortious interference with present or prospective customers[,] . . . no cause of action exists for tortious interference with a business's relationship to the community at large.'" Coach Servs., Inc. v. 777 Lucky Accessories, Inc., 752 F. Supp. 2d 1271, 1273 (S.D. Fla. May 5, 2010) (quoting Ethan Allen, 647 So.2d at 815). This requires the plaintiff to "prove a business relationship with identifiable customers." BPI Sports, LLC v. Labdoor, Inc.,

No. 15-62212-CIV-BLOOM, 2016 WL 739652, at *3 (S.D. Fla. Feb. 25, 2016) (citation omitted). Further, "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." Novell v. Bank of Am. Corp., No. 14-CV-80672-RLR, 2014 WL 7564678, at *3 (S.D. Fla. Dec. 3, 2014) (citation omitted).

Here, the counterclaim alleges that "McKesson intentionally and unjustifiably interfere[d] with the Benzer Parties' [business] relationships [with their customers] by limiting the purchases that could be made by the Benzer Parties and, by extension, the Benzer Parties' ability to service their existing customers." (Doc. # 17 at 31). The Benzer Parties further allege that "McKesson had knowledge of these relationships" and that "[t]he Benzer Parties were damaged by McKesson's conduct." (Id.).

Accordingly, the business relationship in question is that between the Benzer Parties and their existing customers. "In line with . . . precedent, [the Benzer parties] may allege interference with existing customers as such customers would be readily identifiable." BPI Sports, 2016 WL 739652, at *4 (citing cases). However, the Benzer Parties have failed to allege that they had any contractual agreements or understandings with these existing customers. (Doc. # 17 at

22

31); <u>ADT LLC v. Teamtronics, Inc.</u>, No. 14-cv-81589-
Rosenberg/Hopkins, 2015 WL 12866274, at *4 (S.D. Fla. May 18,
2015) ("[I]t is not necessary to name . . . specific customers
[at the pleading stage] . . . so long as there are sufficient
allegations concerning a business relationship *that affords
the claimant existing or prospective legal or contractual
rights*." (emphasis added) (citation omitted)). And, the
Benzer Parties have failed to identify any existing customer
from which the Court could infer that such an understanding
exists. <u>See</u> <u>Agostinacchio v. Heidelberg Eng'g, Inc.</u>, No.
0:18-cv-60935-UU, 2019 WL 3243408, at *10 (S.D. Fla. Feb. 5,
2019) ("While Heidelberg need not plead an exhaustive
description of each client, it must at least plausibly allege
the existence of those customers via some description. . . .
Pleading that Agostinacchio interfered with Heidelberg's
relationship with 'actual or prospective customers' is
insufficient.")

Therefore, the Motion is granted as to this requested
relief and Count VI is dismissed without prejudice. <u>See</u> <u>BPI
Sports</u>, 2016 WL 739652, at *4 (dismissing a vague claim for
tortious interference with a business relationship).

**E.  <u>Tortious Interference with a Business Expectancy</u>**

Lastly, McKesson moves to partially dismiss Count VII,

the Benzer Parties' claim for tortious interference with a business expectancy, to the extent it is "premised on the Benzer Parties' relationship with 'potential customers.'" (Doc. # 20 at 10). In the alternative, McKesson moves the Court to strike Count VII on that basis. (Id.).

The parties agree that the requirements to state a cause of action for tortious interference with a business expectancy are the same as one for tortious interference with a business relationship.[1] (Doc. # 22 at 11 n.2). Treating this as the latter claim, the plaintiff must again allege "a

---

1. Although tortious interference with a business expectancy is a common cause of action in other states, the cause of action of tortious interference with a business relationship is usually applied in these contexts in Florida. See, e.g., Ethan Allen, 647 So.2d at 814 (setting out the elements for tortious interference with a business relationship). Even so, these causes of actions have substantially the same elements, both in Florida and other states. Compare Duty Free, 797 F.3d at 1279 ("Under Florida Law, the elements of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." (citation omitted)), with Tax Int'l, LLC v. Kilburn & Assocs., LLC, 157 F. Supp. 3d 471, 478 (E.D. Va. Jan. 5, 2016) ("To prove tortious interference with business expectancy [in Virginia], Plaintiff must show (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.").

business relationship with *identifiable* customers." BPI Sports, 2016 WL 739652, at *4 (emphasis added).

Here, the Benzer Parties allege that McKesson "intentionally and unjustifiably interfered with" their relationships "with potential customers, lenders, suppliers, and purchasers." (Doc. # 17 at 31-32). Although the Benzer Parties include some facts in their counterclaim as to the potential lender, supplier, and purchaser, they provide no facts as to potential customers. (Id. at 24-26). Without more, "potential customers" are not identifiable under Florida law. See Miracle 7, Inc. v. Halo Couture, LLC, No. 13-61643-CIV-ROSENBAUM/HUNT, 2014 WL 11696708, at *4 (S.D. Fla. Jan. 17, 2014) ("But . . . potential customers are not particular parties, and Halo Couture has not set forth allegations that would suggest that its hope that . . . future customers would continue to buy its products is [anything] more than pure speculation.").

Therefore, the Motion is granted as to this requested relief and Count VII is dismissed without prejudice to the extent that it is premised on a business expectancy with potential customers. See EMPS Indus., Inc. v. KECO Inc., No. 8:17-cv-869-T-17JSS, 2017 WL 10899974, at *2 (M.D. Fla. Nov. 2, 2017) (dismissing without prejudice a claim for tortious

interference because the complaint failed "to identify any of the . . . prospective customer relationships that the Plaintiff claims have been interfered with").

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiff and Counterclaim-Defendant McKesson Corp.'s partial Motion to Dismiss Counterclaim (Doc. # 20) is **GRANTED** in part and **DENIED** in part.

(2) The Motion is **GRANTED** as to Counts II, III, VI, and VII, and **DENIED** as to Count V.

(3) Count II is **DISMISSED** with prejudice. Counts III and VI are **DISMISSED** without prejudice. Count VII is **DISMISSED** without prejudice to the extent it is premised on the Benzer Parties' relationship with potential customers.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 2nd day of December, 2020.

Virginia M. Hernandez Covington
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE